

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 3:23-cr-_053_ |
| | ) | |
| v. | ) | Conspiracy to Commit Wire Fraud |
| | ) | 18 U.S.C. § 1349 |
| SHAUN LINDSEY, | ) | |
| Defendant. | ) | Forfeiture Allegation |
| | ) | |

## CRIMINAL INFORMATION

The United States Attorney charges that:

## INTRODUCTORY ALLEGATIONS

At all times relevant to this Criminal Information:

### Department of Public Works Background

1.       The City of Richmond Department of Public Works ("DPW") is a city governmental entity in Richmond, Virginia, within the Eastern District of Virginia, responsible for providing various engineering, technical, and administrative services to city residents, including solid waste management, roadway maintenance, landscaping, and urban forestry management. DPW provides these services through permanent and temporary DPW employees, as well as by contracting for services with outside vendors.

### Conspirators and their Companies

2.       From on or about February 7, 2005, and continuing through the date of the Criminal Information, SHAUN LINDSEY has been a DPW employee.[1]  As a Senior

---

[1] Lindsey was placed on administrative leave in or about February of 2022.

1

Administrative Technician, LINDSEY was responsible for, among other things, managing and obtaining approval for DPW procurements with outside vendors.

3. From at least on or about August 12, 2015, and continuing through at least December 24, 2021, LINDSEY was the sole owner and operator of V Sora Materials LLC (also doing business as V Sora and Vry Sora), a Virginia Limited Liability Company (hereafter, "V Sora").

4. From at least in or about August of 1996, and continuing through in or about October 2019, co-conspirator-1 ("CC-1") was a DPW senior manager. Throughout his tenure with the DPW, CC-1 managed between approximately 20 and 60 other employees, including LINDSEY. CC-1 was also responsible for managing DPW procurements with outside vendors.

5. From at least on or about February 1, 2013, and continuing through at least May 4, 2020, while working at DPW, CC-1's wife, CC-2, owned and operated Company A, a Virginia Limited Liability Company.

6. At all times relevant to the Criminal Information, LINDSEY's boyfriend, CC-3, owned and operated Company B, a contractor doing business with DPW.

## Controls designed to prevent self-dealing by DPW employees

7. At all times relevant to the Information, Virginia state law and the City of Richmond local ordinance, mirroring the same language, both prohibited public employees from participating in procurement transactions (such as DPW's contracts with outside vendors) when the public employee (or the employee's partner) has a financial interest in that transaction.

8. At all times relevant to the Criminal Information, the City of Richmond placed further restrictions on employee conduct via a "Code of Ethics" applicable to all City of Richmond employees. On or about March 11, 2009, LINDSEY certified that she had received

2

and reviewed this Code of Ethics; the same document was also signed by CC-1 as the supervisor. The Code of Ethics stated in relevant part:

    a. "It is the duty of each employee and official to place loyalty to the city above any private or financial gain."

    b. "Employees shall refrain from taking, ordering, or participating in any official action, which would adversely affect the confidence of the public in the integrity of the City of Richmond."

    c. "No employee of the City of Richmond shall engage in business activity or have any direct or indirect financial interest, which conflicts or would appear to conflict with the fair, impartial and objective performance of officially assigned duties and responsibilities."

    d. "An employee shall avoid action, whether or not specifically prohibited by this administrative regulation, which might result in or create the appearance of the following: (a) Using public office for private gain; (b) Giving preferential treatment to any person. . ."

9.     For all procurements with outside vendors, DPW further required that contracts above $5,000 be competitively bid, with bids solicited from at least three separate vendors.

10.     At no point did LINDSEY and/or CC-1 recuse themselves from DPW decisions involving their own companies and/or the companies of their co-conspirators. Nor did LINDSEY and/or CC-1 disclose to any institution any conflicts of interest arising from their involvement with companies bidding for business with the DPW.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

11.    The allegations in paragraphs 1 through 10, including sub-paragraphs, of this Criminal Information are re-alleged and incorporated as though set forth in full here.

12.    SHAUN LINDSEY and other co-conspirators, known and unknown, beginning at a time unknown, but no later than in or about June 4, 2018, and continuing through in or about October 2021, in Eastern District of Virginia, did knowingly and intentionally combine, conspire, confederate, and agree with individuals, both known and unknown, to commit offenses against the United States, to wit:  beginning prior to in or about June 4, 2018, and continuing through in or about October 2021, the exact dates being unknown, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendant SHAUN LINDSEY unlawfully and knowingly conspired with others, known and unknown, to commit the offense of wire fraud, that is: to knowingly execute and attempt to execute a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, transmitted and caused transmission of writings, signs, and signals in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Scheme and Artifice to Defraud

13.    The purpose of the scheme was for LINDSEY and her co-conspirators, known and unknown, to unlawfully enrich themselves by: (1) using LINDSEY's position of trust at DPW to improperly divert DPW funds to LINDSEY and her co-conspirators; (2) defeating internal DPW controls, city regulations, and Virginia laws designed to prevent improper DPW

4

disbursements; and (3) concealing LINDSEY's and other co-conspirators' ties to the companies bidding on DPW work.

### The Manner and Means of the Scheme and Artifice to Defraud

14.     The manner and means of the scheme and artifice to defraud included, but were not limited to, the following:

15.     LINDSEY created and owned V Sora to bid on DPW projects. Similarly, CC-1, along with his wife, CC-2, created and owned Company A to bid on DPW projects. LINDSEY's boyfriend, CC-3, created and owned Company B, which bid on DPW projects.

16.     LINDSEY and CC-1 designated and approved DPW work to be performed by V Sora, Company A, and Company B. In some instances, the work to be performed was completely fabricated and no such work was ever needed. In other instances, the work was actually performed by DPW employees (that is, City of Richmond employees), not by any outside vendors. In other instances, LINDSEY and her co-conspirators subcontracted the work out for profit upon winning the DPW work.

17.     LINDSEY used her position at DPW to create requisitions for DPW work with outside vendors. LINDSEY and her co-conspirators thereafter generated quotations on behalf companies they owned in response to DPW requisitions.

18.     In some instances, where the procurement amount exceeded $5,000, LINDSEY manufactured false and fictitious straw bids on behalf of competitor companies to engineer LINDSEY and her co-conspirators winning bids for work with DPW.

19.     LINDSEY and her co-conspirators generated invoices on behalf of their companies. As a result, DPW disbursed money to LINDSEY and her co-conspirators'

companies. LINDSEY and CC-1 manipulated DPW systems and their positions of trust at DPW
to approve payments on these invoices.

20.      LINDSEY sent CC-1 a portion of the money she received from the DPW for these
outside vendor transactions within days of receiving payment from DPW. LINDSEY, CC-1, and
CC-2 withdrew monies received from DPW as cash withdrawals.

21.      To perpetuate and conceal her involvement with the fraud scheme, LINDSEY
generated false email traffic between her City of Richmond email address and a private email
address in the name of V Sora.

### Conduct in Furtherance of the Scheme and Artifice to Defraud

22.      From at least January 7, 2016, and continuing through at least May 4, 2020, while
working at DPW and after his retirement, CC-1 owned and operated Company A with his wife,
CC-2. LINDSEY and CC-1, at various points, used their positions of trust at DPW to obtain
approval of DPW requisitions, purchase orders, and disbursements, resulting in the transfer of
DPW funds to Company A. In total, during this time, DPW paid at least $375,474 to Company
A's Wells Fargo Bank account (account number ending in -4674). DPW monies were withdrawn
as cash at ATMs, transferred to CC-1's personal checking account at Wells Fargo (ending in -
7364), and transferred to CC-1's personal savings account at Wells Fargo (ending in -7480).

23.      From at least April 17, 2018, and continuing through at least December 24, 2021,
while working at DPW, LINDSEY owned and operated V Sora. LINDSEY and CC-1, at various
points, used their positions of trust at DPW to obtain approval of various DPW requisitions,
purchase orders, and disbursements, resulting in the transfer of DPW funds to V Sora. In total,
during this time, DPW paid at least $199,527 to V Sora's bank accounts at: 1) Suntrust bank
account (account number ending -9736); 2) C&F Bank (account number ending -6535); and 3)

6

C&F Bank (account number ending -2767). LINDSEY was the sole signatory on all of these accounts. LINDSEY withdrew the money as cash and transferred portions of the funds to CC-1 via wire transfers.

24.     From at least July 2, 2019, and continuing through at least August 14, 2019, LINDSEY's boyfriend, CC-3, owned and operated Company B.  During this time, LINDSEY and CC-1 used their positions of trust at DPW to obtain approval of a DPW requisition, purchase order, and disbursement, resulting in the improper transfer of DPW funds to Company B in the amount of $28,700.

25.     During and throughout the execution of the scheme to defraud, and for the purpose of executing that scheme to defraud, LINDSEY and her co-conspirators transmitted and caused to be transmitted numerous wirings in interstate commerce, to include email traffic and bank wirings.

26.     During the scheme and artifice to defraud, LINDSEY and her co-conspirators engaged in the following fraudulent transactions, among others.

A.  Parker Field Lawnmowing

27.     In early 2019, DPW sought to have overgrown foliage at the Parker Field, an area in Richmond, Virginia, cleared in advance of Fourth of July celebrations that same year. On or about May 21, 2019, LINDSEY communicated to DPW management in an email that an outside vendor would be retained to cut the Parker Field area and that DPW would "'watch' the location to ensure that once the work is completed – that it maintains a good look leading up to the

event." Thereafter, DPW hired an outside vendor to cut down the foliage, and DPW staff performed lawnmowing at the Parker Field every other week.[2]

28.     On or about July 1, 2019, DPW Trade Supervisor A.B. sent an email to LINDSEY, CC-1, and other DPW leadership confirming that lawnmowing at the field had been performed that day. Moreover, another supervisor at DPW, D.H., sent a confirmation email to LINDSEY, CC-1, and other DPW leadership on July 2, 2019 confirming that Parker Field had been cut on July 1, 2019.

29.     Yet, on or about July 1, 2019, LINDSEY created and obtained approval of a requisition request in the DPW purchase order system for a third party contractor to perform "Tractor mowing-ParkerField." The notes on the requisition request stated, "mowing services needed – Parker Field (urgency)." The requisition listed that Parker Field would need to be mowed 16 times before July 5, 2019, at a cost of $300 per mowing. Because the total cost of the requisition was $4,800, just below the $5,000 DPW threshold for competitive bidding, LINDSEY submitted the requisition for Company A directly without the need for a competitive bid process. CC-1 approved the requisition the same day. At all times, LINDSEY knew and intended that Company A would receive public monies for work that Company A would not, in fact, be completing.

30.     On or about July 3, 2019, Company A generated an invoice, falsely representing that Company A had completed 16 tractor mowings of Parker Field (at a cost $300 each). That same day, DPW approved payment for the invoice; on or about July 25, 2019, the City of

---

2 This outside vendor had no association with LINDSEY's or any co-conspirator's companies.

Richmond transferred $4,800 to the Company A bank account at Wells Fargo (account number ending in -4674). CC-1 and CC-2 thereafter withdrew the money as cash.

B. Bridge Christmas Decorations

31.     In December of 2020, DPW leadership sought to set up holiday decorations of Richmond-area bridges. DPW leadership specifically asked LINDSEY whether Company A, with whom DPW has contracted for this work in years past, was available to perform the work. On or about December 7, 2020, LINDSEY informed DPW leadership that Company A was a "NO GO" but that she "ha[d] taken the liberty to reach out to another company called ChristmasDecor in Manakin Sabot – I will keep you posted."

32.     Thereafter, on or about December 11, 2019, referencing an earlier request from LINDSEY, a representative of Subcontractor 1, a light works company from Manakin Sabot, Virginia, sent LINDSEY a proposal for setting up holiday décor on two Richmond-area bridges. The proposal submitted by Subcontractor 1 was to decorate 32 lamp posts for a total cost of $4,800.

33.     Thereafter, LINDSEY negotiated with Subcontractor 1 to have that company reduce their price to $3,600, with the company decorating only 24 lamp posts.

34.     On or about December 13, 2020, LINDSEY submitted a requisition request for "holiday décor both bridges." Thereafter, on or about December 14, 2020, LINDSEY generated a purchase order for holiday décor for two Richmond-area bridges in the amount of $4,500. However, the purchase order was directed towards V Sora, not Subcontractor 1, and LINDSEY knew and intended that her company (V Sora) would accordingly be paid public monies for work that V Sora would not, in fact, be performing.

35.     On or about December 18, 2020, LINDSEY generated an invoice for holiday bridge décor for 24 lamp posts across two bridges in the amount of $4,500 and then obtained approval for it within DPW systems.

36.     In truth, Subcontractor 1 actually performed the work. On or about December 28, 2020, LINDSEY sent Subcontractor 1 representative an email, stating, "Thank you so much for your product and service. We will definitely get on the install schedule much earlier 2021." LINDSEY further stated, "You can forward your invoice as well – I want to begin the payment process."

37.     On or about December 30, 2020, DPW approved payment to V Sora for the holiday décor work. On or about January 4, 2021, the City of Richmond transferred $4,500 to the C&F Bank account of V Sora Materials LLC (account number ending in -6535). LINDSEY was the sole signatory on this account. LINDSEY subsequently withdrew the money as cash at various ATMs.

38.     Thereafter, LINDSEY paid Subcontractor 1 $1,800, half the total amount owed. At all times relevant to the Criminal Information, Subcontractor 1 believed that they had been engaged by DPW, not subcontracted by LINDSEY's personal company, for the work. LINDSEY ultimately did not pay Subcontractor 1 its balance. After LINDSEY was terminated from DPW, when Subcontractor 1 confronted DPW about the $1,800 balance of payment, DPW paid Subcontractor 1 the $1,800 balance – thereby paying twice for the same work.

C. Soil Stabilization Project

39.     In 2019, DPW sought to install soil stabilization riprap along a ditch by Hull Street in Richmond, Virginia. On or before July 2, 2019, before DPW issued the formal purchase order for this work, CC-3 solicited a proposal for this same work from Subcontractor 2, a

Richmond, Virginia hauling and paving company. On or about July 2, 2019, Subcontractor 2 sent CC-3 a proposal estimating that the work would cost $21,250. The same day, CC-3 forwarded the proposal to LINDSEY's personal email address and LINDSEY forwarded the proposal to her work email address.

40.     Thereafter, on or about July 17, 2019, LINDSEY generated bid documentation showing that CC-3 bid $28,700 for the same job. LINDSEY generated fictitious bid documentation on behalf of two other companies for the same work, one of which purportedly declined to submit a bid and the other of which submitted a bid for $34,550. In so doing, LINDSEY orchestrated CC-3 winning the work, with an inflated bid relative to the $21,250 bid of Subcontractor 2. On or about July 17, 2019, LINDSEY sent the fictitious bid documentation to her superiors at DPW.

41.     On or about July 19, 2019, LINDSEY entered a purchase order for this work. CC-1 approved the purchase order. On or about August 2, 2019, CC-3 submitted an invoice for $28,700 for this work. On or about August 14, 2019, DPW paid CC-3 $28,700.

D.  Payments from LINDSEY to CC-1 for DPW work

42.     On several occasions, days after DPW paid LINDSEY's companies for various work, LINDSEY paid a portion of those funds to CC-1, despite knowing and understanding that state law, city ordinance, and the City of Richmond's Code of Ethics explicitly prohibited public employees such as herself from engaging in such transactions.

43.     For instance, on or about May 22, 2020, DPW paid V Sora $13,610 for work on 6 different invoices. Thereafter, on or about May 26, 2020, LINDSEY paid CC-1 $10,845 via check.

11

44.     In another instance, on or about June 19, 2020, DPW paid V Sora $720 for the completion of maintenance servicing on the Main Street train station in Richmond, Virginia. The V Sora invoice number associated with this transaction was 2430. Thereafter, on or about June 23, 2019, LINDSEY paid CC-1 $576 via check, with the check description listing "2430."

* * *

45.     In all, LINDSEY and her co-conspirators fraudulently caused DPW to disburse at least $603,701 in funds to companies owned by LINDSEY and her co-conspirators.

(All in violation of Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

Pursuant to Rule 32.2(a) FED. R. CRIM. P., the defendant is notified that, if convicted of the offenses alleged in Count One of this Criminal Information, the defendant shall forfeit to the United States any property, real or personal, which constitutes, or is derived from, proceeds traceable to the violation. The property subject to forfeiture includes, but is not limited to, the sum of at least $199,527, which represents the amount of proceeds the defendant obtained from the offense, which sum shall be reduced to a money judgment against the defendant in favor of the United States.

12

If any property subject to forfeiture is not available, it is the intention of the United States

to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section

853(p) and Federal Rule of Criminal Procedure 32.2.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated
by 28 U.S.C. § 2461(c) and Title 21, United States Code, Section 853(p).)

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:

Avi Panth
Virginia Bar No. 92450
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Email: avishek.panth@usdoj.gov

13